STATE OF VERMONT
ENVIRONMENTAL COURT

}
In re Roderiques Variance Application }        Docket No. 212-9-08 Vtec
}        (Appeal from Concord ZBA Decision)
}

## Decision on the Merits

William and Elizabeth Roderiques ("Applicants") seek a variance for what they regard as a necessary storage shed on their vacation property along the shore of Miles Pond, with access from Campers Lane, in the Town of Concord. When their application for a variance was denied by the Town of Concord Zoning Board of Adjustment ("ZBA"), Applicants filed a timely appeal with this Court. Applicants are assisted in this appeal by their attorney, Charles D. Hickey, Esq.

The only other party to appear in these proceedings has been the Town of Concord ("Town"), assisted in its defense of the ZBA denial of Applicants' variance request by Town attorney Thomas Ryan Paul, Esq. The parties made valiant efforts to reach resolution of this land use dispute, including engaging an independent mediator, but were unable to reach agreement. The Court thereafter conducted a site visit with the parties on October 7, 2009, followed by a bench trial at the Caledonia County Courthouse in St. Johnsbury.

After the close of evidence, the Court requested that the parties submit post-trial memoranda. The Court has delayed its deliberations, research, and drafting of this Merits Decision due to other writing responsibilities, which the Court sincerely regrets. We endeavor in this Decision to address all factual and legal issues raised in Applicants' appeal.

Based upon the evidence admitted at trial, including that which was put into context by the site visit the Court conducted with the parties, the Court renders the following Findings of Fact and Conclusions of Law:

## Findings of Fact

1.     Applicants are residents of Middletown, Rhode Island, and they have traveled to the Northeast Kingdom of Vermont for vacations for many years. In 2005, Applicants purchased property at 632 Campers Lane that also adjoins the shores of Miles Pond. The property consists of two abutting lots, each 50 feet wide and 100 feet long. The two lots run in series towards the

Pond, such that the property boundary closest to Campers Lane is 50 feet wide,[1] and then travels a total of 200 feet towards the Pond.

2.    At trial, Applicants submitted a survey and site plan of their property as their Exhibit 4. Exhibit 4 reflects an estimated size of Applicants' combined lots of 0.26± acres.

3.    When Applicants purchased their Campers Lane property, it included a seasonal residence that was in somewhat dilapidated condition. Applicants renovated and improved this residence and have used it as a vacation home predominately during the summer months, but occasionally throughout the remainder of the year. Applicants obtained all necessary zoning permits to complete the renovation of their seasonal residence.

4.    Sometime in 2007, another property owner on Campers Lane was disposing of a small camp building on his property. Mr. Roderiques noticed work being done on this property; when he spoke with the neighbor, the neighbor offered to give the camp building to Mr. Roderiques, on the condition that Mr. Roderiques arrange to have the camp building removed from the neighbor's property. Mr. Roderiques agreed and acquired this building for use as a shed on his property.

5.    Mr. Roderiques also noticed a contractor working in the area that had a moving crane large enough to pick up small buildings. He thereafter engaged this contractor to lift and move the donated camp building to his property at 632 Campers Lane.

6.    Mr. Roderiques spoke informally with the Town of Concord Zoning Administrator ("Administrator") about his plan to use the donated camp building as an accessory shed building on his property. Mr. Roderiques understood the Administrator to say that "this would be fine," but later Mr. Roderiques understood that he was mistaken and that a zoning permit would be needed.

7.    After discovering that Mr. Roderiques had moved the shed building onto his Campers Lane property without first obtaining a zoning permit, the Administrator sent a notice of alleged zoning violation letter ("NOV") to Applicants. See Exhibit 10. The Administrator mistakenly addressed his NOV to Applicants at a home address in "Middletown, New Jersey." The NOV nonetheless ultimately was delivered to Applicants at their home in Middletown, Rhode Island, several weeks later.

---

[1] Applicants' property does not have frontage on Campers Lane, since there is a narrow strip of undeveloped land owned by a Mr. and Ms. Brown that lies between Applicants' property and Campers Lane. Applicants' property is therefore a landlocked parcel, but is served by an easement to Campers Lane.

2

8.   Upon receipt of the Administrator's NOV, Applicants advised the Administrator of their correct address and set about preparing an application for a zoning permit for their shed.

9.   Applicants' property lies in the Lakeshore Zoning District ("Lake District"), where buildings and other improvements are required to be set back at least thirty-five feet from the front and side yards, and an identical minimum from the water line of any lake or pond. See Town of Concord Zoning By-Laws, tbl. 5.5 [hereinafter "Bylaws"]. Since Applicants' property is no wider than fifty feet, no building on Applicants' property can comply with these side-yard setback requirements.

10.   Applicants' seasonal residence conforms to the front-yard setback and is regarded as a lawful, preexisting, nonconforming structure as to the side-yard and water setbacks.

11.   Applicants' property is rocky and slopes downward, at some points steeply, towards the waters of Miles Pond. Their seasonal residence occupies one of only two somewhat level areas on their property. The other level area is on the southerly portion of their property, near Campers Lane. It is on this second small level area that Applicants have sited their shed.

12.   Applicants filed their first application for a zoning permit on September 11, 2007. See Town Exhibit B. Applicants did not then have a survey or site map for their property, so they submitted a hand-drawn site map with their application. This site map is roughly drawn and does not contain metes and bounds measurements or monuments to denote their property boundaries.[2] In fact, Applicants were uncertain of their specific boundaries and had attempted to determine those boundaries by consulting with the owners of adjoining properties. At the time of the ZBA hearing (referenced below), Applicants and at least one of their neighbors were unable to resolve the location of their common boundary line. There was some suggestion that the proposed shed may, in fact, be located on that neighbor's property.

13.   The Administrator denied Applicants' 2007 request for a zoning permit, since the shed, as located, would not conform to the Lake District side-yard setbacks. The Administrator, in consultation with Applicants, thereafter forwarded Applicants' application to the ZBA, both as an appeal of his initial denial of their permit request, and as an application for a variance from the side-yard setback requirements.

14.   The ZBA noticed and conducted its hearing on Applicants' appeal and variance application on October 18, 2007. It received testimony from Mr. Roderiques and at least one

---

[2]  A copy of this hand-sketched site map is attached as page 4 of Exhibit B.

3

owner of an adjoining property. The ZBA thereafter issued its written decision on Applicants' variance and zoning permit requests, in which it listed several reasons why it denied Applicants' variance request:

- the Administrator was correct in his determination that Applicants had provided incorrect measurements on the site plan and permit application;

- neither Applicants nor the adjoining property owners had presented a survey or other documentation to clearly establish defined property lines;

- the actual location of one or more of Applicants' boundary lines was uncertain; and

- because of this uncertainty and lack of survey, the distances from the shed to the side yards, and therefore their setbacks and the needed variances, could not be determined.

See 2007 ZBA Decision at Findings ¶¶ 4, 11, and 12 (Oct. 18, 2007).

15. Applicants thereafter hired a surveyor to define the exact location of their boundaries and to assist in resolving any boundary disputes with adjoining property owners. The resulting survey was admitted into evidence at trial as Applicants Exhibit 4.

16. Once Applicants had received a survey of their property and resolved any disagreement as to boundary locations with their neighbors, Applicants submitted a new application for a variance and zoning permit. A copy of this second application was admitted into evidence as Town Exhibit D.

17. The Administrator again denied Applicants' zoning permit application, due to noncompliance with the side-yard setback minimums, and forwarded to the ZBA Applicants' appeal of that denial, together with their request for a variance. The ZBA noticed and conducted its hearing on Applicants' second appeal and variance application on August 21, 2008.

18. The ZBA thereafter issued its written decision on August 29, 2008 ("2008 Decision"), denying Applicants' second variance and zoning permit requests. Applicants thereafter filed a timely appeal of the 2008 Decision with this Court.

19. Applicants' survey (Exhibit 4) depicts their shed as it currently sits on their property; it notes the shed dimensions as sixteen feet long and fourteen feet wide, with the longer side somewhat parallel to Campers Lane. The site map attached to Applicants 2008 application (pages 4 and 5 of Exhibit D) depicts Applicants' shed as having been turned so that the shorter side somewhat parallels Campers Lane and therefore provides a slight narrowing of the needed variances. Copies of this site map (Exhibit D, pp. 4 and 5) are attached to this Decision for the reader's reference.

4

20.    In their 2008 Decision, the ZBA rendered several findings in favor of Applicants' variance request, including that:

- Due to the narrowness of the lot (fifty feet) and the cumulative setback requirements (thirty-five feet from each side boundary), "there is no possibility that the property can be developed in strict conformity with the provisions of the [Bylaws]. Authorization of a variance is necessary to enable any development of the property." 2008 Decision at Findings ¶¶ 4 and 5.

- Applicants did not create the unnecessary hardship that now restricts the siting of a shed on their property; that hardship is created by the narrowness of their lot and the overlapping of the side yard setbacks. See id. at Findings ¶ 6.

- The shed as sited "would not substantially or permanently impair the appropriate use or development of adjacent property, reduce access to renewable energy resources or be detrimental to the public welfare." Id. at Findings ¶ 7.

21.    No appeal was taken from these positive findings. However, the ZBA also issued several negative findings regarding Applicants' proposed shed, including:

- The shed "would alter the essential character of the neighborhood" in that the size and proposed location cause the shed to have an appearance that "is significantly larger than is appropriate for this lot in this neighborhood." Id. at Findings ¶ 7.[3]

- "The variance, if authorized, will not represent the minimum variance that will afford relief and will not represent the least deviation possible . . . ." Id. at Findings ¶ 8.

22.    The neighborhood surrounding Applicants' property is mostly developed with seasonal or vacation homes; there are few full-time residences surrounding Miles Pond. Many and perhaps most of the developed lots are much smaller than the three acre minimum size required by the current Bylaws.

23.    Applicants provided credible testimony at trial as to the prevalence of separate storage sheds on residential properties throughout their neighborhood. Exhibit 6 consists of a three-page printout of the portion of the Vermont Interactive Map (maintained by the Vermont Center for Geographic Information) that shows the southerly boundary of Miles Pond, which includes the neighborhood where Applicants' property is located. Of the developed properties in this neighborhood, most include separate storage sheds, unattached to the vacation residence.[4]

---

[3]  The second quotation here is an explanation found in the "DECISIONS AND CONCLUSIONS" section on page 4 of the 2008 Decision.

[4]  No specific count of developed properties without sheds was provided at trial. Examination of Exhibit 6 reveals that of the over fifty developed properties depicted along the full expanse of Campers Lane, about eight developed properties do not appear to include a detached storage shed.

24. Thirty-three of the neighborhood properties include separate storage sheds. Most neighborhood sheds are larger than the shed on Applicants' property; only one is smaller by one foot in width. The largest shed measures 40 feet long by 24 feet wide; the smallest shed measures 16 feet long by 12.5 feet wide. Many of the thirty-three sheds in the neighborhood are depicted on Applicants' Exhibits 7 and 8.

25. Most, although not all, neighborhood sheds are as close or closer as Applicants' shed to the edge of Campers Lane. Applicants' shed is located outside of and therefore conforms to the minimum front yard setback of thirty-five feet. To locate their shed further away from Campers Lane could require significant excavation and perhaps the blasting of rock and ledge. From the rear side of the shed, facing Miles Pond, Applicants' property is steeply sloped towards the Pond and contains rocky soils and ledge.

26. Applicants intend to use their shed for storage of four-wheeled all-terrain vehicles ("ATVs") they frequently use on their property and on nearby public access trails. They also intend to store gasoline, propane for cooking, and other household flammables in their shed. Their shed is as small as it can be and still accommodate these items. If Applicants were required to construct a smaller storage shed, they would need to store these flammable items in their home or in an additional storage shed.

27. Mr. Roderiques is a retired fireman; his professional experience has taught him the dangers of failing to properly store gasoline, propane, and other flammable materials. While no federal or Vermont law or regulation prohibits the personal storage of gasoline, propane, and other flammables in a residential basement, such storage is considered hazardous. The National Fire Protection Association ("NFPA") recommends that gasoline, propane, or other flammables be stored in a separate storage structure, away from residences, electricity, and other origins of ignition. See NFPA 30: Flammable and Combustible Liquids Code.[5]

28. Because Applicants use their Miles Pond property as a vacation residence and are sometimes away from their property for days or weeks at a time, they fear that storage of flammable materials in their residence could cause significant or total loss of their home.

---

[5] When asked during trial what laws or regulations pertained to the storage of gasoline, propane, and other flammable liquids, Mr. Roderiques said that he did not know. After trial, Applicants filed with the Court a copy of the publication entitled "NFPA 30: Flammable and Combustible Liquids Code," together with a printout from the Vermont Department of Public Safety, confirming that Vermont has adopted this NFPA code. No objection has been made to the submission of these post-trial filings into the record; we find this NFPA code helpful in understanding the concerns Mr. Roderiques testified to at trial, and therefore admit the NFPA code as Exhibit 1A.

29. Applicants' proposed use of their shed is identical, or very similar to, the use to which their neighbors put their various sheds. Most all neighbors with sheds on their properties use the sheds to store ATVs, snowmobiles, or other recreational vehicles, together with gasoline, propane, and other flammables they use in the course of enjoying their vacation properties.

30. Most, if not all, individuals having vacation homes on Miles Pond use ATVs, snowmobiles, and other recreational vehicles in the course of using and enjoying their properties and the surrounding public access lands.

31. Applicants understand that if they do not obtain a variance and zoning permit for their shed, they will have to remove it from their property. Applicants have pledged, if they do receive a variance and permit for their shed, to complete repairs to the shed roof and siding and paint and landscape the structure, so as to minimize its visual impact from Campers Lane. No testimony was received at trial that Applicants' shed is visible from any adjoining properties.

## Discussion

In this de novo proceeding, we are generally charged with considering anew the merits of Applicants' variance and zoning permit requests. The general premise that directs us in such proceedings is that we look at the evidence anew and pay no regard to the decision from which an appeal has been taken. In re: Gizmo Realty/VKR Assocs., Docket No. 199-9-07 Vtec, slip op. at 4 (Vt. Envtl. Ct. Apr. 30, 2008) (Durkin, J.). Our review, however, is not of all legal issues that an appealed application presents, but only those legal issues that have been preserved for our review by an appellant. In re Jolley Assoc., 2006 VT 132, ¶ 9, 177 Vt. 491 (quoting In re Garen, 174 Vt. 151, 156 (2002)); see also V.R.E.C.P. 5(f); 10 V.S.A. § 8504(h); Vill. of Woodstock v. Bahramian, 160 Vt. 417, 424 (1993). We therefore limit our review here to only those legal issues preserved for our review by Applicants' Statement of Questions, and render findings upon those legal issues, based upon the evidence presented at our trial.

Before we address those issues, we must address a procedural issue raised by the Town: whether Applicants' pending application is barred by the doctrine of improper successive applications. We address this issue first, since the determination suggested by the Town would render our analysis of the legal issues raised by Applicants unnecessary.

## I.     Is the pending application barred by the successive-application doctrine?

Land use litigants must also adhere to much of the same constraints as other civil litigants: our procedures are for the most part governed by the Vermont Rules of Civil and

Appellate Procedure (see V.R.E.C.P. 5(a)(2)) and must comport with the constitutional "case and controversy" limitations and the res judicata/collateral estoppel doctrines barring the relitigation of disputes. In re McGrew, 2009 VT 44, ¶ 10 (quoting In re Carrier, 155 Vt. 152, 157–58 (1990)). But the uniqueness that arises in land use litigation includes a need to recognize that market demands and planning desires cause the uses of land to change. Thus, our jurisprudence has developed to accommodate changes in circumstances that afford flexibility when reviewing subsequent land use applications concerning the same property, while respecting the finality of litigation that has concluded. This balance is incorporated into the successive application doctrine. McGrew, 2009 VT 44, ¶ 11 (citing In re Dunkin Donuts Site Plan Approval, 2008 VT 139, ¶ 9) (other citations omitted).

The successive-application doctrine bars the relitigation of the same land use application that was previously denied, even when the applicant has presented more compelling evidence in support of their land use proposal. Id. at ¶ 15. The barrier to relitigation of the same application acts to preserve the doctrine of finality and to "protect property owners from the 'harassment' of repetitive [land use] applications." Id. at ¶ 11 (quoting Dunkin Donuts, 2008 VT 139, ¶ 9). This respect for the finality of litigation must be balanced, however, with a flexibility to acknowledge the changes to circumstances surrounding land use proposals, particularly changes made by an applicant in direct response to the circumstances that lead to the prior denial of their earlier application. Jolley Assoc., 2006 VT 132, ¶ 12 (citing Carrier, 155 Vt. at 58 ("[A] zoning board or planning commission may not entertain a second application concerning the same property after a previous application has been denied, unless a substantial change of conditions had occurred or other considerations materially affecting the merits of the request have intervened between the first and second application.")). Thus, a successive application concerning the same or similar land use on the same property cannot be successful, unless the circumstantial changes articulated in Jolley and other analogous Supreme Court determinations have been met.

Simply returning to a zoning board with better evidence, particularly evidence that could have been presented in support of the first application, is not sufficient to overcome the bar against improper successive applications. McGrew, 2009 VT 44, ¶ 13. Thus, if we were faced here with an application that was presented a second time, merely with better boundary data, such as Applicants did here with the presentation of a boundary survey (Exhibit 4), it is less likely that Applicants' successive application could survive. However, Applicants returned to

8

the ZBA with more significant changes. First, they resolved the boundary uncertainty that existed when they and their neighbors first appeared before the ZBA. While their relations had been cordial, this boundary discrepancy was so substantial as to provide some of the foundation for the ZBA denial of Applicants' first application. Second, they realigned their storage shed so that its most narrow faces would run parallel to their roadside boundary line, thereby reducing the needed side-yard variances. This realignment was in direct response to the ZBA's negative finding that the variances Applicants requested in their first application "will not represent the minimum variance that will afford relief." 2007 ZBA Decision at Findings ¶ 10.

In addressing the concerns first expressed by the ZBA, Applicants provided substantive responses to the shortcomings in their first application and addressed issues that caused the ZBA to express concerns in its 2007 Decision. Applicants presented a second application for approval of their storage shed, but because of the circumstantial changes concerning their boundary dispute resolution and realignment of their shed, we conclude that their second application is not barred by the successive application doctrine. We therefore conclude that review of Applicants' second application is appropriate.

## II.    Remaining variance criteria

Development may only occur in the Town of Concord when it has been determined to conform to the Bylaws. Bylaws § 5. Variances, when granted, allow for development that is not in strict conformity with the Bylaws, provided the ZBA determines that the applicable variance criteria have been satisfied. The Bylaws do not specifically recite the variance criteria, but rather make reference to the specific statutory provisions, now found in 24 V.S.A. § 4469(a). The applicable criteria require:

(1) There are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property, and that unnecessary hardship is due to these conditions, and not the circumstances or conditions generally created by the provisions of the bylaw in the neighborhood or district in which the property is located.

(2) Because of these physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the bylaw, and that the authorization of a variance is therefore necessary to enable the reasonable use of the property.

(3) Unnecessary hardship has not been created by the appellant.

(4) The variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, substantially or permanently impair the

9

appropriate use or development of adjacent property, reduce access to renewable energy resources, or be detrimental to the public welfare.

(5) The variance, if authorized, will represent the minimum variance that will afford relief and will represent the least deviation possible from the bylaw and from the plan.

24 V.S.A. § 4469(a).

There is a traditional reluctance to grant variances since, by their very nature, variances constitute individual exceptions to the applicable zoning provision. In re Mutschler, 2006 VT 43, ¶ 7, 180 Vt. 501 (mem.) (citing In re Maurice Memorials, 142 Vt. 532, 535 (1983)). This reluctance is codified in the directive that a variance request may only be granted after a determination that the applicant has satisfied all five variance criteria. Id. at ¶ 9 (citing L.M. Pike & Son, Inc. v. Town of Waterford, 130 Vt. 432, 435 (1972)). Applicants here may therefore only obtain the requested variance for each side-yard setback requirement by securing positive findings under each of the five criteria stated in § 4469(a).

As noted in the introductory paragraph of this Discussion, our jurisdictional review is limited to the legal issues preserved for our review by an appellant. Jolley Assoc., 2006 VT 132, ¶ 9. While Applicants' Statement of Questions contains five paragraphs, all issues raised pertain to the two negative determinations made by the ZBA: first, that the proposed shed will alter the essential character of the neighborhood and, second, that the shed as sited does not represent the least deviation possible from the zoning regulations. Thus, we have before us only the two criteria codified in the first portion of 24 V.S.A. § 4469(a)(4)[6] and subsection (5). Since the ZBA rendered positive determinations on the remaining three (and a half) variance criteria, and no party appealed those positive determinations, our positive determinations on the two legal issues preserved for our review in this appeal will result in Applicants being entitled to the requested variance and zoning permit.

The evidence presented at trial causes us to respectfully arrive at opposite conclusions from those rendered by the ZBA on the two challenged variance criteria. First, we find no support in the evidence presented that Applicants' shed will alter the essential character of their neighborhood. In fact, the credible evidence only supports a determination that the shed as

---

[6] We understand that only the first portion of § 4469(a)(4) remains at issue, since the ZBA concluded that Applicants shed as sited "would not substantially or permanently impair the appropriate use or development of adjacent property, reduce access to renewable energy resources or be detrimental to the public welfare." 2008 Decision at ¶ 7.

currently proposed, including the remaining repair and landscaping Mr. Roderiques has pledged to complete, conforms to and complements the character of this neighborhood.

The vast majority of developed properties along Campers Lane have similar or larger storage sheds; many of those neighboring sheds are located as close as or closer to Campers Lane as Applicants' shed. The neighbors having sheds put them to the same or similar uses as proposed by Applicants: to store ATVs, snowmobiles, or other recreational vehicles; and to store gasoline, propane, and other flammables away from their vacation residences. This separate storage of flammable items seems prudent for these specific properties, especially since the vast majority of these properties are vacation homes and sometimes not visited for days or weeks at a time. For these reasons, we conclude that Applicants' shed as proposed, and conditioned upon the repair, painting, and landscaping Mr. Roderiques has pledged, will not alter the essential character of their neighborhood and therefore conforms to the challenged provisions of 24 V.S.A. § 4469(a)(4).

Whether Applicants' shed represents the minimum deviation from the applicable zoning provisions to afford relief poses a more difficult and subjective factual question. We are assisted, to some extent, by the factual determinations already made by the ZBA and left unchallenged before this Court: first, the ZBA determined that "there is no possibility that the property can be developed in strict conformity with the provisions of the [Bylaws and a]uthorization of a variance is necessary to enable any development of the property." 2008 Decision at Findings ¶¶ 4 and 5. Second, the ZBA determined that that the hardship Applicants now face in attempting to site a storage shed on their property was not created by them, but rather was created by the narrowness of their lot and the overlapping of the side-yard setbacks. See 2008 Decision at Findings ¶ 6. In fact, no shed or other structure could be added to Applicants' property and respect these overlapping side-yard setbacks. Thus, the ZBA has already concluded that some variance is warranted in this case. Id. at Findings ¶¶ 4 and 5.

Some commentators have long asserted that local Vermont zoning boards have abused or exceeded their statutory authority to grant variances. See generally Michael D. Donovan, Note, Zoning Variance Administration in Vermont, 8 Vt. Law Rev. 371 (1983). Although Vermont has sometimes been regarded as following a more strict interpretation of the propriety of variances, our Supreme Court has consistently recognized variances, where justified, to be appropriately "employed as 'an escape hatch from the literal terms of an ordinance which, if

11

strictly applied, would deny a property owner all beneficial use of his land and thus amount to confiscation.'" In re Mutschler, 2006 VT 43, ¶ 7, 180 Vt. 501 (mem.) (quoting Lincourt v. Zoning Bd. of Review, 201 A.2d 482, 485–86 (R.I. 1964)). Thus, while commentators and courts often caution that the statutory authority for variances limits their application, variances remain a recognized alternative when a strict adherence to zoning provisions will bring about unjust results. Id. (citing People ex rel. Fordham Manor Reformed Church v. Walsh, 155 N.E. 575, 578 (N.Y. 1927) (Cardozo, C.J.).

In the pending application, we have an unchallenged ZBA determination that a variance is necessary for the reasonable use of Applicants' property. The remaining legal issue before us is a narrow one: does the shed Applicants propose for their property represent the least deviation from zoning that their reasonable use requires? We conclude that it does. Applicants' presented credible evidence that their shed could not be made smaller and still serve the necessary storage purposes for their property. With one minor exception, Applicants' neighbors have sheds on their properties that are the same size or larger than Applicants' shed; some of those neighbors' shed are much larger than Applicants' shed and evidence equal or more significant conflicts with the applicable zoning setback provisions. Applicants propose to reorient their shed, so as to reduce the needed setback variances. To deny Applicants' variance request would be tantamount to concluding that no shed should be allowed on their property. The credible evidence presented supports our conclusion that Applicants have sized and sited their shed to deviate in the least possible manner from the zoning setback provisions, and still serve the needed purpose.

Given the evidence presented at trial and the unique procedural posture presented— namely, that the ZBA had already rendered positive determinations on three variance criteria and a portion of a fourth, we conclude that Applicants have satisfied all applicable criteria and are entitled to the requested variance.

## Conclusion

For all the reasons stated herein, we conclude that Applicants are entitled to variances from the applicable side yard setback requirements in Town of Concord Zoning By-Laws, tbl. 5.5, so that they may site their storage shed as shown on the portion of their site map that is attached to this Decision. As a consequence of this grant of the requested side yard setback variances, we also conclude that Applicants' zoning permit application for their proposed storage shed should be **GRANTED**, conditioned upon Mr. Roderiques completing the roof and siding

12

repair, painting, and landscaping he pledged to complete, so as to minimize the visual impact of his storage shed.

These proceedings are hereby **REMANDED** to the Town of Concord Zoning Administrator, solely for the purpose of completing the ministerial act of issuing a zoning permit to Applicants in conformity with this Decision.

A Judgment Order accompanies this Decision. This completes the current proceedings in this Court concerning this appeal.

Done at Berlin, Vermont this 27th day of April, 2010.

Thomas S. Durkin, Environmental Judge



PIER

PIER

UNMARKED POINT

IRON PIPE FOUND

RKED POINT

IRON PIPE FOUND

S 62°57'12" W 53.32'
REC. DIST. 50 FT.
3.59'

12.84'

camp lot 21
5336.399 SQ. FT.
0.12 ACRES

REC. DIST. 100 FT.
S 29°22'44" E
100.00'

residence

roof overhang

roof overhang

residence

landing

walkway

REC. DIST. 100 FT.
S 31°07'11" E 90.17'

camp lot
22

residence

OUT BUILDING

IRON PIPE FOUND

N 63°49'02" E 50.22'

LOT 21A
6066.156 SQ. FT.
0.14 ACRES

OUT BUILDING

105 feet from residence

OUT BUILDING

IRON ROD SET

camp lot
20

DAVID DUNCAN
SHARI ANN DUNCAN
DAVID JOSEPH DUNCAN
DONNA LEWIS
RICK TERONE QUERO

LOT 20A/19A

S 29°22'44" E 119.68'

RODERIQUES SHED
16.4 X 13.5 FEET

GRAVEL DRIVE

LUELLA M. DEMERS TRUSTEE
OF THE LUELLA M. DEMERS
INTER VIVAS TRUST

STEEP SLOP

N 29°26'43" W 122.63'

RID

OUT BUILDING

25 feet

35 feet

LOT 22A

35 FT.

20 INCH MAPLE
12 INCH ASH

IRON ROD WITH
SET 6 IN. BEI

S 60°26'37" W 50.00'

25 INCH HEMLOCK

BOULDERS

DRILL HOLE
SET IN BOULDER

GRAVEL DRIVE

LANDS OF BROWN
BETTY BROWN
50, PAGE 31

MPER